IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

DYNESHIA D. JOSEPH,             *

     Plaintiff,             *

vs.                         *

                                CASE NO. 4:09-CV-157 (CDL)

COLUMBUS BANK AND TRUST    *
COMPANY,

                           *

     Defendant.             *

O R D E R

Plaintiff, Dyneshia D. Joseph ("Joseph"), alleges that Defendant, Columbus Bank and Trust Company ("CB&T"), discriminated against her because of her race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").[1] CB&T responds that it did not discriminate against Joseph in any way and that it terminated Joseph's employment because she failed to adequately perform her job. CB&T seeks summary judgment as to Joseph's

---

[1] Joseph's Complaint also alleged that CB&T discriminated against her based on her gender in violation of Title VII, Compl. ¶¶ 14-21, ECF No. 1, and that CB&T breached Joseph's employment contract, *id.* ¶¶ 22-24. Joseph failed to address either claim in response to CB&T's motion for summary judgment. *See generally*, Pl.'s Resp. to Def.'s Mot. for Summ. J. Attach. 1, Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J., ECF No. 30-1. Therefore, the Court deems Joseph's gender discrimination and breach of contract claims abandoned. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

claim.  For the following reasons, CB&T's Motion for Summary Judgment (ECF No. 25) is granted.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.  56(a).  In determining whether a genuine dispute of material fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

The evidence, viewed in the light most favorable to Joseph, reveals the following.

CB&T is a state-chartered commercial bank with its main office and eighteen branch banking locations in Columbus, Georgia.  CB&T hired Joseph, a black female, in September 2000 as a teller.  Throughout the time period relevant to this action, Joseph was employed as a teller at CB&T's Wynnton

Branch.  The Wynnton Branch is one of CB&T's smaller branches, typically housing nine to ten employees at any one time.

## I.   Joseph's Job Responsibilities at CB&T

Joseph's title throughout her six-year tenure with CB&T was Teller I.  Teller I is an entry-level position that involves providing face-to-face banking services to customers in both the bank lobby and drive-through banking stations.  As a Teller I, Joseph was required to perform two categories of functions. First, Joseph was responsible for accurately and efficiently conducting routine transactions such as receiving and paying out money, cashing checks, accepting deposits and withdrawals, accepting various other payments, and issuing money orders and traveler's checks.  Pl.'s Resp. to Mot. for Summ. J. [hereinafter Pl.'s Resp.] Attach. 2, Joseph Decl. [hereinafter Joseph Decl.] Ex. 3, Teller I Job Summary/Core Responsibilities, ECF No. 30-2.  Second, Joseph was responsible for various sales referral functions such as: (1) "[d]emonstrat[ing] a solid working knowledge of bank products and services;" (2) "[a]ssess[ing] customer needs and deliver[ing] services or refer[ring] [customers] to other team members in accordance with bank sales strategy;" (3) "[a]ctively promot[ing] [CB&T's] services and products, answer[ing] questions, and direct[ing] customers to appropriate departments for specialized services with each bank transaction;" (4) "[r]efer[ring] customers to

3

other bank staff for product sales and advanced problem resolution;" and (5) "[m]eet[ing] customer referral goals as set by the Branch Manager." *Id.*

## II. Joseph's Early Tenure with CB&T

CB&T contends that Joseph was never an easy employee to manage. Joseph's supervisors throughout her tenure with CB&T uniformly reported that Joseph was a complainer, who was subject to constant mood swings. Def.'s Br. in Supp. of Mot. for Summ. J. [hereinafter Def.'s Br.] Ex. 2, Takemoto Aff. ¶¶ 7-8, ECF No. 25-5 [hereinafter Takemoto Aff.]; Def.'s Br. Ex. 3, Moore Aff. ¶¶ 8-11, 16, ECF No. 27-3 [hereinafter Moore Aff.]; Def.'s Br. Ex. 4, Newby Aff. ¶ 6, ECF No. 25-7 [hereinafter Newby Aff.]. CB&T also contends that Joseph was excessively tardy to and absent from work. Takemoto Aff. ¶ 8; Moore Aff. ¶¶ 13-14; Newby Aff. ¶¶ 7-8. For example, between January 1, 2006 and April 25, 2007, Joseph was late for work sixty-four times. Def.'s Br. Ex. 5, Wyatt Aff. ¶ 15, ECF No. 25-8. During that same period, Joseph took over 156 hours of paid time off, exclusive of vacation and holidays. *Id.*

Joseph, unsurprisingly, denies that she was a difficult employee. Joseph Decl. ¶¶ 3-4. Joseph also denies having a history of tardiness and absenteeism. *Id.* ¶¶ 37-38. She explains that the Wynnton Branch was "really relaxed" and that "many of the employees might log in late from time to time."

*Id.* ¶ 38.   Joseph also contends that her absences were not a problem since "[a]ny time [she] was off work, [she] was either taking [her] earned leave or was excused by a doctor."   *Id.* ¶ 52; *see also id.* ¶ 37 (stating Joseph had "sick time" remaining when she left CB&T).

## III. CB&T's Emphasis on Customer Referrals

By 2006, CB&T had begun to put greater emphasis on customer referrals by its employees.   Def.'s Br. Ex. 1, Cardin Aff. ¶ 8, ECF No. 27-2 [hereinafter Cardin Aff.]; Takemoto Aff. ¶ 9. Tellers like Joseph were a particular focus of this emphasis since they have daily, face-to-face contact with numerous customers.   Cardin Aff. ¶ 8; Moore Aff. ¶ 12.   Tellers were expected to engage each customer personally, learn that customer's needs, and refer them to an appropriate person to meet those needs.   Moore Aff. ¶ 12; Cardin Aff. ¶ 8.

As part of its emphasis on customer referrals, CB&T implemented an incentive plan ("Teller Incentive Plan") in August 2006.   Joseph Decl. Ex. 2, 2006 Teller Incentive Plan 1, ECF No. 30-2.   Under the Teller Incentive Plan, tellers like Joseph were expected to make sufficient referrals to result in at least four closed transactions per month.   *Id.*   Tellers who exceeded that minimum threshold were entitled to an additional monthly bonus.   *Id.* at 1-2.

In late January 2007, Colby Cardin succeeded Austin Tofinski as Manager of the Wynnton Branch. As part of the transition, Cardin, Tofinski, and Assistant Branch Manager Josefina Takemoto met with each branch employee to allow Cardin to get to know them, and to discuss how Cardin intended to manage the branch. On January 30, 2007, Cardin, Tofinski, and Takemoto met with Joseph. During that meeting, Cardin told Joseph that CB&T had three primary expectations of her as a teller. Cardin Aff. ¶ 15. First, that she handle cash transactions flawlessly; second, that she have personal knowledge of repeat customers and provide extra customer services; and third, that she look for customer needs and demonstrate that CB&T offered numerous financial products which could help them be financially successful. *Id.*

During that same meeting Joseph told Cardin that she had been a Teller I for over six years, that during that time she had taken on extra responsibilities, and that she wanted to be promoted to Teller II. Joseph Decl. Ex. 5, Joseph Right Steps Individual Performance & Development Plan 6, ECF No. 30-2. The job description for a Teller I and Teller II are very similar; a Teller II, however, "is required to refer and sell more than a Teller I." Joseph Decl. ¶ 9. Specifically, a Teller II is required to have "advanced" knowledge of bank services, as opposed to the "solid" knowledge a Teller I requires. *Compare*

Joseph Decl. Ex. 3, Teller I Job Summary/Core Responsibilities *with* Joseph Decl. Ex. 4, Teller II Job Summary/Core Responsibilities, ECF No. 30-2. Likewise, a Teller II must meet "stretch" (i.e. higher) customer referral goals rather than the normal Teller I customer referral goals. *Id.* After reviewing the Teller II competencies, Cardin, Tofinski, and Takemoto told Joseph that the most pressing area where she needed improvement to increase her chances for promotion was increasing her customer referral efforts. Joseph Right Steps Individual Performance & Development Plan 6; Joseph Decl. ¶ 18. They noted that Joseph had only closed seven referrals over the past three years and that, therefore, her sales were too low to promote her to Teller II. Cardin Aff. ¶ 14; Joseph Right Steps Individual Performance & Development Plan 6. Joseph explained that because she frequently ran the drive through station alone and was also handling other duties, she did not have the opportunity to make customer referrals. Joseph Decl. ¶¶ 16-17.

**IV. Joseph's Career Development Plan**

As a result of Joseph's desire for promotion, Cardin, Takemoto, and Joseph met again on February 9, 2007 to prepare an action plan for Joseph's development using CB&T's Right Steps Evaluation System (the "Development Plan"). Joseph Decl. ¶¶ 20, 22. The Development Plan was divided into six action items. Joseph Right Steps Individual Performance & Development Plan 6.

Step one was designed to increase Joseph's product knowledge, which would help her increase her referrals. *Id.* Joseph committed to learn about one specific financial product per week and then report on that product to Takemoto or Cardin, thereby making an effort to learn the details of each financial service CB&T offered. *Id.* Cardin and Takemoto committed to allow Joseph to rotate more frequently from the drive through teller station into the lobby and give her time off from her teller station to observe personal bankers so that she could decide whether that was a career direction she wished to pursue. *Id.* Joseph was asked to register and attend training classes offered by CB&T, and Cardin personally committed to sit with her at her teller station and to make suggestions about how she might improve her referrals based on his observation of her interaction with customers. *Id.* Joseph was also urged to develop a more positive attitude and to become more involved in group activities with other Team Members. *Id.*

At the conclusion of the February 9 meeting, Joseph stated that she did not like having to make product referrals and that she wanted to find another job within CB&T for which she was better suited. Joseph Dep. 92:14-20, 94:21-24, ECF No. 23; Cardin Aff. Ex. B, Cardin February Sales Activity Report at 1, Feb. 9, 2007 entry, ECF No. 27-2 [hereinafter Cardin February Sales Activity Report]. Therefore, Joseph asked Cardin and

Takemoto to delay the implementation of the Development Plan for about a month, stating that if she was unable to locate another job within that time, they could revisit the plan. Cardin February Sales Activity Report at 1, Feb. 9, 2007 entry. Cardin, however, denied Joseph's request.[2] Cardin Aff. ¶ 20. Cardin contends that he denied the request because Joseph's performance in the Teller I position required immediate improvement. *Id.* Likewise, Joseph testified at her deposition that she immediately started work on her Development Plan because she "knew that [she] had to keep [her] job." Joseph Dep. 86:7-12. Now, however, Joseph contends that she "was never told that [she] needed to immediately improve [her] sales to keep [her] Teller I job." Joseph Decl. ¶ 15. Joseph further contends that "[a]ll discussion/plans regarding increasing [her] referrals and sales were an effort to consider [her] for promotion, not to consider whether [she] should be terminated." *Id.*; *see also id.* ¶ 22 ("I was told that in order to be promoted to Teller II my sales referrals would have to improve. However, this was not a condition for continued employment as a Teller 1."); Joseph Right Steps Individual Performance & Development

---

[2] Joseph now contends Cardin agreed to delay the implementation of the Development Plan for thirty days, Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 34, ECF No. 30-3, but she has produced no evidence to support that assertion. Further, during her deposition Joseph clarified that Cardin and Takemoto did not agree to delay implementation of her Development Plan. Joseph Dep. 92:22-95:2-11.

Plan 6 (stating Joseph should "[e]ffectively meet her threshold of 4 referrals per month and more in order to be considered or recommended for future promotions").

## V.  The Follow-Up

Four weeks later, on March 7, Cardin again met with Joseph as she had suggested.  During that meeting, Cardin reviewed the action items noted in Joseph's Development Plan with disappointing results.  Cardin Aff. ¶ 24.

Over the past four weeks CB&T had offered Joseph multiple opportunities for improvement.  Wynnton Branch Head Teller Stephanie Barber had instituted a rotation to give Joseph greater access to lobby customers.  Joseph Dep. 74:2-5; Cardin Aff. ¶ 24.  Joseph was also given an opportunity to observe a personal banker to determine whether she wanted to pursue that career.  Joseph Dep. 74:7-10; Cardin Aff. ¶ 24.  Finally, Cardin had observed Joseph in the teller line, but they had not met for a coaching session.  Joseph Dep. 75:21-77:4 (acknowledging Cardin observed her at the drive through window but denying they met for coaching session); *but see* Cardin Aff. ¶ 24 (contending coaching session occurred).

Over that same period, however, Joseph made only minimal effort.  Joseph had not made any weekly reports about new CB&T financial products she had learned about and had not asked for help on product knowledge from either Cardin or Takemoto.

10

Joseph Dep. 69:6-71:25. After observing personal bankers at work, Joseph reported that she was not interested in that position. *Id.* at 74:12-21. Joseph had also failed to complete any training classes offered by CB&T. *Id.* at 77:13-78:1. Cardin was concerned that Joseph's attitude had not improved, and he knew that she had been absent multiple days in the few weeks since their last meeting. Cardin Aff. ¶ 24. Finally, Joseph's referrals had not improved as of the date of this meeting, and Cardin believed that she was not making any serious effort to improve. Cardin Aff. ¶ 24.

During the meeting Joseph informed Cardin that "sales were not for her." Cardin Aff. ¶ 23. When he asked her why, she responded that she had a hard time asking people to consider products and services that she did not herself have or believe in, such as credit cards. *Id.* Joseph also told Cardin that she did not like to sell because she did not like to hear "no." *Id.*

After the March 7 meeting, Joseph's customer referral efforts briefly improved. Joseph closed one referral that very day and two more on March 9. The Wynnton Branch management believed that this result showed what Joseph was capable of if she made the effort and, consequently, recognized her for her improvement. Cardin Aff. ¶ 26.

## VI.  Joseph Throws In the Towel

About two weeks later, on March 19, Takemoto and Head Teller Barber met with Joseph to give her an update on her "Over and Short (cash accounting)" report.  Takemoto Aff. ¶ 23. During this conference, Takemoto told Joseph that she needed to be more consistent in her sales efforts.  *Id.*  Joseph responded by saying that she had been doing this for years, that sales were not for her, and that she was going to come to work, wait on her customers, and go home.  Takemoto Aff. ¶ 24; Joseph Dep. 107:2-108:6.  Joseph also told Takemoto that "I am throwing in the towel," Takemoto Aff. ¶ 24; Joseph Dep. 108:8-12, and that "I am just waiting to move on to other opportunities," Takemoto Aff. ¶ 25; Joseph Dep. 114:10-12.  Takemoto made sure she understood Joseph by asking:  (1) "This means you do not want to be trained for anything?"  To which Joseph responded: "I do not."  Takemoto Aff. ¶ 25; Joseph Dep. 113:9-19.  (2) "You do not want to be considered for any upcoming opportunities?"  To which Joseph responded: "I do not."  Takemoto ¶ 25; Joseph Dep. 114:1-4.  (3) "This isn't for you?"  To which Joseph responded "Yes."  Takemoto Aff. ¶ 25; Joseph Dep. 114:6-8.[3]

---

[3] Joseph's deposition and Takemoto's affidavit differ slightly on the exact words used during the Takemoto-Joseph exchange.  *Compare* Takemoto Aff. ¶ 25 ("'This is it for you?' Ms. Joseph responded 'Yes.'") *with* Joseph Dep. 114:6-8 ("Q. . . . she asked, This isn't for you, and you said, Yes? A. Yes, because I was trying to post out."). The Court construes this immaterial difference in the light most favorable to Joseph.

## VII. Joseph's Final Warning

When Takemoto reported to Cardin what Joseph said during the March 19 counseling, he became very concerned and called his supervisor, Community/Regional Executive II Cissy Giglio. Cardin Aff. ¶ 30. On March 22, Giglio, Takemoto, and Cardin met with Joseph for a coaching session. During that meeting, they reviewed Joseph's referral activities and noted that although Joseph's closed referrals briefly rose after the March 7 meeting, since then, her referrals had stopped.[4] Cardin Aff. ¶ 30. They talked about the importance of consistency, stating that the minimum was just a goal, and that she should always be pursuing referrals. Cardin Aff. Ex. C, Cardin March Sales Activity Report at 1, Mar. 23, 2007 entry, ECF No. 27-2 [hereinafter Cardin March Sales Activity Report]; Cardin Aff. ¶ 30. They emphasized that CB&T wanted to address every customer's needs, and was not just asking its tellers to talk to a few people as needed to meet a quota. Cardin Aff. ¶ 30. Joseph stated that she understood, and would endeavor to be more consistent. Cardin March Sales Activity Report at 1, Mar. 23, 2007 entry; Cardin Aff. ¶ 30.

---

[4] After the March 7 meeting, Joseph closed one referral that very day and two more on March 9, ultimately closing five referrals by March 22. Cardin Aff. Ex. C, Cardin March Sales Activity Report at 1, Mar. 23, 2007 entry, ECF No. 27-2.

On the day after the March 22 meeting, Joseph had five closed referrals. Cardin Aff. ¶ 31. Subsequently, however, Joseph had no other referrals until April 19, when she had one closed referral. *Id.* Further, during the month after the March 22 meeting, Joseph missed nine working days, including four days of vacation time and five days at home with sick children. Cardin Aff. ¶ 32; Joseph Decl. ¶ 53. Those absences placed a hardship on the small team at the Wynnton Branch, including its management. Cardin Aff. ¶ 32; Takemoto Aff. ¶ 28.

## VIII.    Joseph's Termination

As a result of her absenteeism and continuing failure to consistently perform the customer referral aspect of her job, the Wynnton Branch leadership removed Joseph as an active teller and placed her on administrative leave with pay from April 26, 2007 through May 30, 2007. Joseph was encouraged to seek other employment with CB&T during that period. Cardin Aff. ¶ 32; Cardin Aff. Ex. D, Note to Supervisor File from C. Cardin 1, Apr. 25, 2007, ECF No. 25-4 [hereinafter Termination Notice]. When Joseph had not located another position with CB&T by May 30, 2007, she was terminated. Cardin Aff. ¶ 33. Joseph was told in writing three reasons for her termination: (1) lack of consistency in sales performance; (2) poor attendance; and (3) lack of teamwork. Termination Notice 1; Cardin Aff. ¶ 34.

**IX. Joseph's Replacement**

At approximately the same time Joseph was discharged, a second teller position came open at the Wynnton Branch. Takemoto Aff. ¶ 31. Thirty-three candidates were initially identified for the two positions and eleven were interviewed by a panel of hiring managers, including Takemoto. Takemoto Aff. ¶ 33. Felicia Jackson, a black female, was initially offered Joseph's position, but she turned it down to take another job at CB&T. *Id.* Ultimately, Phillip Rodgers, a white male, and Lacey McDonald, a white female, were selected by the panel to fill the two open teller positions at the Wynnton Branch. *Id.*

DISCUSSION

Joseph contends that she was discriminated against based on her race in violation of Title VII. Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Where, as here, a plaintiff presents no direct evidence of discriminatory intent, the plaintiff may proceed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *E.g., Crawford v. Carroll*, 529 F.3d 961, 975-76 (11th Cir. 2008). Under this framework, the

plaintiff must first establish a prima facie case of discrimination. *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). "Once the plaintiff has made a prima facie case, a rebuttable presumption arises that the employer has acted illegally." *Id.* "The employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action." *Id.* "If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." *Id.* "Despite these shifts in the burden of production, the ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against her." *Id.*

## X.    Joseph's Prima Facie Case

"Presenting a prima facie case is not onerous as it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008). Under the *McDonnell Douglas* framework, a plaintiff may establish a prima facie case by showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside of her protected class or was treated less favorably than a similarly-situated individual outside of her

protected class.  *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).  It is undisputed that Joseph, a black female, is a member of a protected class and that she suffered an adverse employment action when CB&T terminated her employment.  The Court also finds that Joseph was qualified for her Teller I job at CB&T, as evidenced by her employment in that position for six and a half years.[5]  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("[I]n cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred." (alteration in original) (internal quotation marks omitted)).  The question, therefore, is whether Joseph's evidence shows that she was replaced by someone outside of her protected class or was treated differently than similarly-situated employees.

Joseph has failed to demonstrate that CB&T treated similarly-situated individuals outside of her protected class more favorably.  In support of her prima facie case, Joseph

---

[5] "Of course, the fact that [Joseph] was qualified to perform her job competently does not mean that she actually did so, an issue that is sharply contested by the parties."  *Alvarez*, 610 F.3d at 1265.  "The qualifications and experience that get a candidate hired for a job and the performance that is satisfactory enough for her to keep it are two different things."  *Id.*  Because Joseph's job performance is bound up in the inquiry into whether CB&T's proffered reason for firing her was a pretext for discrimination, the Court will consider it at the pretext stage of the analysis.  *Id.*

contends that Peggy Kennon was a similarly-situated employee outside of her protected class who, like Joseph, failed to consistently perform the customer referral aspect of her job, but was not terminated. Kennon was a white female who, like Joseph, was a teller at CB&T's Wynnton Branch.[6] Therefore, to the extent that she is outside Joseph's protected class and has similar job responsibilities, Kennon is a proper comparator to Joseph. Joseph must also show, however, that Kennon and Joseph were "involved in or accused of the same or similar conduct and [were] disciplined in different ways." *Maynard*, 342 F.3d at 1289 (internal quotation marks omitted). Under this standard, the Court finds that Kennon is not a valid comparator.

First, Kennon is not a valid comparator because she and Joseph were not "involved in or accused of the same or similar conduct." *Id.* (internal quotation marks omitted). CB&T contends that it terminated Joseph because: (1) she was unwilling to consistently perform the sales aspect of her teller job; and (2) she had poor attendance. Def.'s Br. 13; *accord* Termination Notice 1; Cardin Aff. ¶ 34. Like Joseph, Kennon

---

[6] Kennon was a Teller II while Joseph was a Teller I. The job descriptions for a Teller I and Teller II, however, are "virtually identical." Joseph Decl. ¶ 9; *see also supra* pages 6-7 (describing slight differences between Teller I and Teller II). Therefore, the Court assumes that Joseph and Kennon are proper comparators based on their job responsibilities. *See Rioux*, 520 F.3d at 1281 ("[D]ifferences in job ranks between a plaintiff and another employee are not, in and of themselves, dispositive as to whether the two individuals may be compared for purposes of evaluating a discrimination claim.").

also failed to consistently perform the sales aspect of her teller position. Cardin February Sales Activity Report at 1, Feb. 9, 2007 entry (noting that Kennon's sales "slowed to a virtual halt"). Joseph, however, has pointed to no evidence that Kennon exhibited the poor attendance that CB&T contends plagued Joseph's tenure. Therefore, the Court finds that Joseph and Kennon were not "involved in or accused of the same or similar conduct," *Maynard*, 342 F.3d at 1289 (internal quotation marks omitted), and consequently are not proper comparators, *see Rioux*, 520 F.3d at 1280 ("The quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." (internal quotation marks omitted)).

Kennon is also not a valid comparator because she and Joseph were not treated differently. After recognizing that Joseph and Kennon were not fulfilling their sales responsibilities, CB&T offered both employees the same opportunity to improve, including the opportunity to explore transitioning to a personal banker position. Kennon accepted CB&T's offer and made a successful transition to a personal banker position. Joseph, however, was not interested in a personal banker position, Joseph Dep. 74:12-21, and instead pursued a promotion to Teller II, a position that required even

more customer referrals. Joseph also failed to respond to CB&T's efforts to help her improve her customer referrals, eventually telling her managers that "sales were not for her," Cardin Aff. ¶ 23, that she was "throwing in the towel," and that she was "just waiting to move on to other opportunities," Takemoto Aff. ¶¶ 24-25; Joseph Dep. 108:8-12, 114:10-12. Because both Kennon and Joseph were given the same opportunity to improve, which Kennon accepted but Joseph rejected, the Court finds that they were not treated differently by CB&T and thus, are not proper comparators. *See Holifield v. Reno*, 115 F.3d 1555, 1562-63 (11th Cir. 1997) (per curiam) (finding comparator not treated more favorably when transferred because employer attempted to transfer the plaintiff but no transfer opportunity was available).

For the foregoing reasons, the Court finds that Joseph has failed to demonstrate that CB&T treated similarly-situated individuals outside of her protected class more favorably. Joseph may still, however, establish a prima facie case of discrimination by demonstrating that CB&T replaced her with a person outside of her protected class. *Maynard*, 342 F.3d at 1289. Although CB&T initially offered Joseph's position to a black female, thereby casting doubt upon any inference of discrimination, it is undisputed that CB&T eventually replaced Joseph with a white male. Takemoto Aff. ¶ 33. Therefore, for

purposes of Joseph's prima facie case, where her burden is "not onerous," *Rioux*, 520 F.3d at 1275, the Court will assume that Joseph's eventual replacement by a white male is sufficient to establish a prima facie case of discrimination. Accordingly, the burden shifts to CB&T to articulate a legitimate, non-discriminatory reason for Joseph's termination.

## XI. CB&T's Legitimate, Non-Discriminatory Reason

An employer's burden to rebut an inference of discrimination by presenting legitimate, non-discriminatory reasons for its employment action is "exceedingly light." *Holifield*, 115 F.3d at 1564 (internal quotation marks omitted). The employer "need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff." *Alvarez*, 610 F.3d at 1265. CB&T has consistently asserted that it terminated Joseph because: (1) she was unwilling to consistently perform the sales aspect of her teller job; and (2) she had poor attendance. Def.'s Br. 13; *accord* Termination Notice 1; Cardin Aff. ¶ 34. These reasons are not discriminatory and thus, satisfy CB&T's burden. The burden, therefore, shifts back to Joseph to present evidence that CB&T's reasons are pretext for discrimination.

## XII. Pretext

Joseph may satisfy her burden of showing pretext "either by offering evidence that [CB&T] more likely than not acted with a discriminatory motive, or by showing that its proffered reasons are not credible." *Alvarez*, 610 F.3d at 1265. To show pretext, Joseph "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (internal quotation marks omitted). Joseph, however, "is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer." *Id.* (internal quotation marks omitted). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Id.* at 1265-66 (internal quotation marks omitted). A reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

Here, Joseph contends that CB&T's proffered reasons for her termination are inconsistent and therefore unworthy of credence. Pl.'s Resp. Attach. 1, Pl.'s Mem. of Law in Opp'n to Def.'s Mot.

for Summ. J. 14-15, ECF No. 30-1 [hereinafter Pl.'s Mem.].  The
present record refutes Joseph's argument.  CB&T's reasons for
Joseph's termination have been consistent and are certainly non-
discriminatory.  Moreover, Joseph has produced no evidence which
casts any doubt upon them.

Joseph first contends that her sporadic bursts of customer
referral effort demonstrate that her termination based on her
sales performance was pretextual.  *See* Pl.'s Mem. 15 ("The
record reveals that Ms. Joseph doubled the sales quota for
March[] 2007, but was fired anyway.").  Joseph's evidence of
brief and temporary improvement, however, does nothing to rebut
CB&T's unwavering contention that she was terminated because of
her *inconsistent* sales performance.  *See* Termination Notice 1;
*see also* Cardin Aff. ¶ 34 (stating CB&T terminated Joseph
because of her lack of consistency in sales performance); Def.'s
Br. 13 (stating CB&T discharged Joseph because of her failure to
consistently perform the sales aspect of the teller job).
Further, Joseph's evidence that she met her customer referral
quota during one month does not raise a genuine issue of
material fact as to the true reason she was fired.  CB&T
contends that it terminated Joseph because she was unwilling to
consistently perform the sales aspect of her teller job.  Def.'s
Br. 13.  CB&T contends that it believed Joseph would not
consistently perform the sales aspect of her teller job for two

reasons: (1) she expressly told them so on multiple occasions; and (2) her inconsistent sales performance demonstrated that although she was capable of meeting her sales goal, she was not interested in doing so. Def.'s Reply Br. 7, ECF No. 32. Therefore, Joseph's evidence that she met her customer referral quota during one month is not inconsistent with CB&T's belief, based on Joseph's own statements and other performance, that she was unwilling to consistently perform the sales aspect of her teller job. *See Alvarez*, 610 F.3d at 1266 ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.").

Joseph also contends that CB&T's complaints regarding her attendance are contrived. According to Joseph, "there is no evidence of negative information or counseling for tardiness or absenteeism noted in all of [her] personnel file." Pl.'s Mem. 16. Again, the record refutes Joseph's argument. As early as December 2003, Joseph's supervisor at CB&T's St. Mary's Branch verbally counseled her regarding her tardiness and absenteeism. *See* Newby Aff. Ex. A, Employee Counseling Record 1, Dec. 22, 2003, ECF No. 25-7; *see also* Newby Aff. ¶ 7 ("Joseph was not dependable and was often late."). Joseph's subsequent supervisors throughout her tenure at CB&T consistently echoed the same concerns. Moore Aff. ¶ 13 (stating that there was a

"continuing problem with Ms. Joseph's attendance"); Takemoto Aff. ¶¶ 8, 23, 28 (stating she initially noticed that Joseph "miss[ed] a good bit of work," that "her progress was being threatened by a somewhat alarming rate of absenteeism," and that she was terminated because of her absenteeism); Cardin Aff. ¶¶ 24, 27, 32 (stating Joseph had "multiple days of absenteeism," that "her progress was being threatened by a somewhat alarming rate of absenteeism," and that she was terminated because of her absenteeism). In light of this evidence, Joseph's own opinion that her attendance was "not a problem" is not sufficient to raise a genuine issue of material fact as to the true reason she was fired. *See Holifield*, 115 F.3d at 1565 ("[W]here the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence.").

Joseph finally contends that she can show pretext with evidence that CB&T treated her less favorably than other similarly-situated employees. As explained above, however, Joseph has failed to demonstrate that CB&T treated her any differently than a similarly-situated employee outside of her protected class such that a reasonable factfinder could conclude that CB&T terminated Joseph because of her race.

In summary, the Court finds that Joseph has failed to produce any evidence from which a reasonable factfinder could conclude that CB&T's articulated legitimate, non-discriminatory reasons were pretext for discrimination. Accordingly, CB&T is entitled to summary judgment as to Joseph's Title VII discrimination claims.

CONCLUSION

For the foregoing reasons, CB&T's Motion for Summary Judgment (ECF No. 25) is granted.

IT IS SO ORDERED, this 1st day of April, 2011.

S/Clay D. Land
_____
        CLAY D. LAND
UNITED STATES DISTRICT JUDGE